844

UNITED STATES of America

v.

Harold KONIGSBERG (Appellant in 14563), Joseph Juliano (Appellant in 14565), John Joseph Zax (Appellant in 14566), Joseph Celso (Appellant in 14567) and Joseph Nalewajka (Appellant in 14564).

Nos. 14563–14567.

United States Court of Appeals
Third Circuit.

Argued June 16, 1964.

Decided Aug. 13, 1964.

Rehearing Denied in No. 14563,
Sept. 18, 1964.

Certiorari Denied Dec. 7, 1964.

See 85 S.Ct. 327, 334.

Raymond A. Brown, Jersey City, N. J., for appellants Konigsberg and Nalewajka; Daniel E. Isles, Orange, N. J., for appellant John Joseph Zax; S. M. Chris

Franzblau, Newark, N. J., for appellant Joseph Juliano; and Michael A. Querques, Orange, N. J., for appellant Joseph Celso (Irving I. Vogelman, Jersey City, N. J., Daniel E. Isles, Orange, N. J., on the brief).

David M. Satz, Jr., Newark, N. J., (Paul Nejelski, Asst. U. S. Atty., on the brief) for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellants Konigsberg, Nalewajka, Juliano and Celso were indicted, tried and convicted of unlawful possession of goods stolen from interstate commerce in violation of Title 18 U.S.C. § 659. Appellant Zax was indicted, tried and convicted of unlawful concealment of goods valued in excess of $5,000 which had been stolen from interstate commerce, in violation of 18 U.S.C. § 2315.

Appellants argue that they had standing to move for the suppression of evidence, to object to its introduction and that the evidence should have been suppressed.

The case centers around the hijacking of some 3,000 men's suits in Parksville, New York. Approximately 1,700 of these were brought to Bayonne, New Jersey and placed in an old garage at 15 West 22nd Street that city. There was substantial evidence that on the night of January 11, 1962, the garage was located in a very poor neighborhood. It was unheated, its windows were constantly being broken by neighborhood children, it had been vacant since the early part of 1961, at least on one occasion the police had removed some old drunks who had entered through a side door. The owner of the building, testifying on behalf of the defense, said that he didn't take care of the building, that he wanted to get rid of it.

Zax said that he had leased this garage on a month to month basis at $100 a month in December, 1961. Levine, the landlord, a witness for Zax, said the latter rented the place for two months.

Zax said he gave Levine a hundred dollars cash. Levine says this was paid him " * * * the end of December in 1961." Zax claimed that he desired to store some furniture of the "Garden State Betterment League" in the garage. He had some furniture moved in during the first week of January 1962 and then had it taken out " * * * because it was raining in there. It was all wet and it was getting—the leather was starting to—I told them to take it back again because I wasn't going to do nothing more there for a while." The oil burner would not start because it was full of water. Asked regarding his intentions for the garage, he answered, "Well, I figured we would hold it for a while and try to get a tenant for it." He testified that around January 6, 1962, one Joseph Pope told him he " * * * would like to use it [the garage] for a week or two * * * I said, Well, you will have to get out if I get a steady tenant" and he said, "All right. I will rent it for a week or two." And he said "How much do you want * * *?" And I said "$50." Q. "And did you lease it to him?" A. "Yes." Around the second of January 1962, Zax saw two fellows in the garage who gave him "no good answer" as to what they were doing there. They had a bottle with them anyhow. Zax also explained that entrance could be made into the building "through the back". According to him, his intention had been to have glass put in the broken windows. However, on January 11, 1962, the windows had all been covered from the inside with plywood. Agent Tootell testified that Zax told him that he had personally boarded up the windows of the first floor of the garage building after he rented it from Levine. Zax during the critical period was manager of a saloon called the Hoo-Ha Club which was across the street from the garage.

In January 1962, prior to the 10th of the month, Walter L. Parker, a Federal Bureau of Investigation agent of approximately fourteen years experience, received a telephone call from a reliable

confidential source telling him that "there was apparently an unlimited quantity of Bond clothes available that was being disposed of in the Bayonne, New Jersey area." Some numbers on the tags of the clothing were given and the clothing was said to be in the area of the Hoo-Ha Club. The Bureau checked the clothing identification with the manufacturer who identified it as part of the stolen shipment. There was testimony that the reputation of Zax, the "operator of this bar" and at least some of its patrons " * * * in law enforcement is not too good". Because of all this the Bureau started a surveillance of the Hoo-Ha and garage location on the evening of January 10th. A car was noticed entering the garage about 8:30 that night. It backed out about ten minutes later and parked on 22nd Street. Several suits with white tags on them were seen lying on the back seat of the automobile. Appellant Juliano suddenly appeared on 22nd Street. A little later a man who came from the Hoo-Ha drove the car away.

About 9:30 the next night, Juliano moved an automobile from in front of the garage to allow a station wagon to back in. Several men left the Hoo-Ha and went into the garage and its door was closed. For about the next hour there was no light from the garage visible to the watching agents. The latter did hear " * * * the rustling of papers and a lot of laughter." Then the garage door was raised from the inside. Four Bureau agents were about two feet in front of the door as it opened. Their testimony is that the lights were off in the garage but with the light from the street and from their flashlights they saw in the garage piles of suits on the floor and in the station wagon. Appellant Celso was in the driver's seat of the station wagon. The agents told the people in the garage they were under arrest. Juliano started to walk out. He and Celso, Konigsberg and Nalewajka who were also in the garage, were taken into custody. Under the circumstances, a search warrant, which had been obtained earlier,

was not used. Zax was not in the garage at the time. He was arrested the next day.

Prior to trial the defendants moved to suppress the evidence of the stolen suits. The trial court took testimony and heard exhaustive argument on that motion for seven days. The motion as to Konigsberg, Juliano, Celso and Nalewajka was denied at the conclusion of the argument on the grounds: that the garage at the time of the seizure of the suits was not a building within the purview of the Fourth Amendment whereby search thereof without a warrant would constitute an invasion of the privacy of any of the defendants; that none of the defendants had standing to challenge the seizure as persons aggrieved by unlawful search and seizure and that " * * as a fact the Agents acting pursuant to the provisions of 18 U.S.C. § 3052 did have reasonable ground to believe at the time the arrests were made that each person in the garage had committed or was committing a felony."

Against the overwhelming proof to the contrary, appellants make no attempt to argue that the garage involved was appellants' house within the purview of the Fourth Amendment in which they were entitled to Constitutional protection of their privacy. None of the defendants, including Zax, had a then present possessory interest in the garage. The only one, according to Zax as a trial witness, who had the right at that time to use the building was the mysterious Mr. Pope to whom Zax said he had rented the premises for a week or two on January 4th, 5th, 6th or 7th. Zax asserted that he had received the agreed fifty dollars rent from Pope and had given him a key. As the trial judge mentioned in his opinion, there had been some suggestion by counsel for the other four defendants that the latter were in the building with the permission of Pope but there is no record support for this. Certainly, Pope was not produced at the trial. Zax stated regarding him, "I know he has not been around in quite a while." Beyond question if appellants were legitimately

in the garage as invitees or guests of Pope as sublessee they might well have been under the Fourth Amendment umbrella. However, that is not the situation and, as above noted, there is no pretension that it is.

 What appellants are really saying definitely and directly is that since they were caught cold in the garage with the stolen clothes, they were in possession of the clothes and therefore they do not have to prove either a right to be on the premises or to the clothes. Appellants point to their indictment for possession of merchandise stolen in interstate commerce as bringing them within the rule of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The Jones decision concerned a prosecution for violation of federal narcotic laws. The defendant had been convicted under 26 U.S.C. § 4704(a), with having "purchased, sold, dispensed and distributed" narcotics not in or from the "original stamped package" and under 21 U.S.C. § 174 for having "facilitated the concealment and sale of" the same narcotics, knowing them to have been imported illegally into the United States. Both those statutory provisions permit conviction upon proof of the defendant's possession of the narcotics and, with respect to 26 U.S.C. § 4704(a), of the absence of the appropriate stamps. As the Court said p. 258, 80 S.Ct. p. 730, "Possession was the basis of the Government's case against petitioner." The entire point of the Jones opinion as far as we are concerned on this appeal is that the Supreme Court there extended the doctrine that a genuine possessory interest in the premises involved made out a sufficient interest in the premises to establish such person as one aggrieved by the search. The Court (page 267, 80 S.Ct. page 734) extended the doctrine to include " * * anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him." That necessary condition did not exist here. Nor does the ambivalent argument that possession of the stolen clothes in the defendants "eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized, which ordinarily is required when standing is challenged." Jones p. 263, 80 S.Ct. p. 732. That holding was specifically directed to the sui generis problem before the Court as to which the latter held p. 263, 80 S.Ct. p. 732, "The same element in this prosecution [narcotics] which has caused a dilemma, i. e., that possession both convicts and confers standing, eliminates any necessity for a preliminary showing of an interest in the premises searched or the property seized, *which ordinarily is required when standing is challenged."* (Emphasis supplied).

In Jones, by statute, proof of possession was enough to convict. The controlling law of this appeal has no such provision or intimation. Possession is only one element of the crime charged. The theft, interstate commerce, knowledge of the theft and value of the stolen clothes all were matters of proof by the Government without which the charge would fall as a matter of law. The Jones rule governs as of course in a proper case. It is not applicable to the issue before us. Cf. United States v. Romano, 203 F.Supp. 27, 30–31 (D.C.D.Conn.1962). Ramirez v. United States, 294 F.2d 277 (9 Cir. 1961).

 Appellants also argue that the arrests of the four defendants in the garage were without probable cause. The reason advanced for this proposition is that "At the time the arrest was announced the Agents were without reasonable grounds to believe that the persons arrested had committed or were in the process of committing a felony." Appellants in this statement are, as they must, giving the converse of the statutory power to arrest without warrant. 18 U.S.C. § 3052. Actually the Agents had with them a search warrant for the garage building issued earlier in the day, January 11, 1962. At the garage, prior to the opening of its door from the inside, the Agents knew that some suits resembling the stolen shipment and bearing

identification tags like those marking the missing suits had been brought from the garage the night previous. They had a whole series of incidents, some of which are briefly alluded to in the statement above, focusing on the Hoo-Ha Club, its management and habitues with particular reference to the garage, its condition, use and contents. The Agents were directly in front of and close to the garage door, prior to any opportunity of serving the warrant. At that time the door was opened from within and rose up leaving the interior of the garage in the plain view of the Agents. They, without search, saw a mass of men's suits with identification tags, piled up in a station wagon in the garage and on the floor thereof. Upon the entire factual circumstances, the Agents then had justifiable grounds for believing that a felony had been and was being committed. Arresting the four defendants in the garage was proper under the statute and called for on the part of the Agents.

■ Appellants allege substantial error because their motion for the name of the informant referred to in the above factual statement was denied. In this instance reliance is placed upon Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). That opinion sets out the basic standards under which the trial judge may require disclosure of an informant's identity. It occurs, as Mr. Justice Burton said for the Court, pp. 60–61, 77 S.Ct. p. 628, "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, * * *." From our own study of this record, the disclosure of the informer's name was palpably not essential to the fair determination of this cause. Nor was its relevancy and helpfulness to the defense shown. The preservation of the informer's anonymity is to encourage and protect him in performing his obligation to communicate knowledge of commission of crimes to law enforcement officials. As

the Court said in Roviaro, p. 62, 77 S.Ct. pp. 628–629:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

The trial judge in this matter under its particular facts was well within his sound discretion in refusing to permit the informer's identity to be revealed.

■ The conviction of Zax for the statutory offense of concealment of the stolen property is protested as inconsistent with the other verdicts returned and therefore the result of passion, etc. It is urged that acquitting Zax of possessing and storing the property makes it impossible for a reasonable jury to find him guilty of being a part of the deliberate, criminal concealment of the suits after their theft. It would seem to have weighed heavily with the jury, as far as the possession charge was involved, that Zax admittedly was not in the garage with the suits as were the other four when arrested. Pointing to the obvious sharp distinction between storage and concealment, the jury did not find anyone guilty of storage. The evidence was all to the effect that the suits were concealed in the dilapidated garage for the purpose of processing them for surreptitious sale, not for storage.

Zax was the lessee of the garage. He did testify that he subleased it to Pope for one or two weeks. The jury may not have believed this. There was valid evidence that Zax had to do with the boarding up of the garage windows during the critical period. He had the garage locks

changed at that time. There was evidence that Zax stated that as late as January 9, 1962, he had allowed a truck driver, not identified, to unload his truck in the garage. An Agent testified that Zax, together with Nalewajka and Juliano, on January 9 and 10, 1962 while in the Hoo-Ha Club took turns looking across the street in the direction of the garage. The same Agent on January 9, 1962 saw Zax go from the Hoo-Ha and returned shortly thereafter " * * * with some pieces of cardboard, a hammer and what appeared to be some thumb tacks." Then he and Nalewajka left and the Agent saw that "they were walking directly to this big building where there is an old garage there." Under all of the evidence the jury reasonably could, as it did, find Zax guilty of primary relationship to the concealment of the suits.

On behalf of appellant Konigsberg, by way of supplemental brief, it is argued that the latter was denied the assistance of counsel under Escobedo v. State of Illinois, 84 S.Ct. 1758, 12 L.Ed.2d 977, op. filed June 22, 1964. In that case petitioner was, according to the Supreme Court p. 1760, " * * * a 22-year-old of Mexican extraction with no record of previous experience with the police, * * *." The Supreme Court stated the facts as follows:

"On the night of January 19, 1960, petitioner's brother-in-law was fatally shot. At 2:30 a. m. that morning, petitioner was arrested without a warrant and interrogated. Petitioner made no statement to the police and was released at 5 p. m. that afternoon pursuant to a state court writ of habeas corpus obtained by Mr. Warren Wolfson, a lawyer who had been retained by petitioner.

"On January 30, Benedict DiGerlando, who was then in police custody and who was later indicted for the murder along with petitioner, told the police that petitioner had fired the fatal shots. Between 8 and 9 p. m. that evening, petitioner and his sister, the widow of the deceased, were arrested and taken to police headquarters. En route to the police station, the police 'had handcuffed the defendant behind his back,' and 'one of the arresting officers, told defendant that DiGerlando had named him as the one who shot' the deceased. Petitioner testified, without contradiction, that the 'detectives said they had us pretty well, up pretty tight, and we might as well admit to this crime,' and that he replied, 'I am sorry but I would like to have advice from my lawyer.' A police officer testified that although petitioner was not formally charged 'he was in custody' and 'couldn't walk out the door.'

"Shortly after petitioner reached police headquarters, his retained lawyer arrived. The lawyer described the ensuing events in the following terms:

" 'On that day I received a phone call [from "the mother of another defendant"] and pursuant to that phone call I went to the Detective Bureau at 11th and State. The first person I talked to was the Sergeant on duty at the Bureau Desk, Sergeant Pidgeon. I asked Sergeant Pidgeon for permission to speak to my client, Danny Escobedo. * * * ' "

The attorney was not allowed to see his client. Continuing with the facts, the Court said p. 1760:

"It is undisputed that during the course of the interrogation Officer Montejano, who 'grew up' in petitioner's neighborhood, who knew his family, and who uses 'Spanish language in [his] police work,' conferred alone with petitioner 'for about a quarter of an hour * * *.' Petitioner testified that the officer said to him 'in Spanish that my sister and I could go home if I pinned it on Benedict DiGerlando,' that 'he would see to it that we would go home and be held only as witnesses, if anything, if we had made a statement against DiGerlando * * *, that we would be able to go home

that night.' Petitioner testified that he made the statement in issue because of this assurance. Officer Montejano denied offering any such assurance.

"A police officer testified that during the interrogation the following occurred:

"'I informed him of what Di-Gerlando told me and when I did, he told that DiGerlando was [lying] and I said, "Would you care to tell DiGerlando that?" And he said, "yes, I will." So, I brought * * * Escobedo in and he confronted DiGerlando and he told him that he was lying and said, "I didn't shoot Manuel, you did it."'

"In this way, petitioner, for the first time admitted to some knowledge of the crime. After that he made additional statements further implicating himself in the murder plot."

The Assistant State's Attorney "* * * testified that he did not advise petitioner of his constitutional rights and it is undisputed that no one during the course of the interrogation so advised him."

The Supreme Court of Illinois originally held the statement inadmissible and reversed the conviction, saying:

"It seems manifest to us, from the undisputed evidence and the circumstances surrounding defendant at the time of his statement and shortly prior thereto, that the defendant understood he would be permitted to go home if he gave the statement and would be granted an immunity from prosecution."

On rehearing, the conviction was affirmed, the court finding the confession was voluntary. As to that phase of the matter, the Supreme Court, p. 1762, commented:

"The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference. When petitioner request-

ed, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of 'an unsolved crime.' Spano v. New York, 360 U.S. 315, 327, 79 S.Ct. 1202, 1209 [3 L.Ed.2d 1265] (STEWART, J., concurring). Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so. At the time of his arrest and throughout the course of the interrogation, the police told petitioner that they had convincing evidence that he had fired the fatal shots. Without informing him of his absolute right to remain silent in the face of this accusation, the police urged him to make a statement.[5] As this

"5. Although there is testimony in the record that petitioner and his lawyer had previously discussed what petitioner should do in the event of interrogation, there is no evidence that they discussed what petitioner should, or could, do in the face of a false accusation that he had fired the fatal bullets.

Court observed many years ago:

"'It cannot be doubted that, placed in the position in which the accused was when the statement was made to him that the other suspected person had charged him with a crime, the result was to produce upon his mind the fear that, if he remained silent, it would be considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person, and it cannot be conceived that the converse impression would not also have naturally arisen, that by denying, there was hope of removing the suspicion from himself.' Bram v. United States, 168 U.S. 532, 562, 18 S.Ct. 183, 194, 42 L.Ed. 568.

"Petitioner, a layman, was undoubtedly unaware that under Illinois law an admission of 'mere' complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots. [People v.] Escobe-

do v. Illinois, 28 Ill.2d 41, 190 N.E. 2d 825. The 'guiding hand of counsel' was essential to advise petitioner of his rights in this delicate situation. Powell v. Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158. This was the 'stage when legal aid and advice' were most critical to petitioner. Massiah v. United States, supra [377 U.S. 201], 84 S.Ct. [1199] at 1202 [12 L.Ed.2d 246]. It was a stage surely as critical as was the arraignment in Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114, and the preliminary hearing in White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193. What happened at this interrogation could certainly 'affect the whole trial,' Hamilton v. Alabama, supra, 368 U.S. at 54, 82 S.Ct. at 159, since rights 'may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes.' Ibid. It would exalt form over substance to make the right to counsel, under these circumstances, depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder."

And on p. 1764, the Court, speaking directly to the undisputed drive for a confession in Escobedo said, "There is necessarily a direct relationship between the importance of a stage to the police in their quest for a confession and the criticalness of that stage to the accused in his need for legal advice."

From the above statement of the exact situation in Escobedo, the Court concluded, p. 1765:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342, 83 S.Ct. [792], at 795 [9 L.Ed.2d 799] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

The Court strongly emphasized its above finding in the final paragraph of its opinion, saying:

"Nothing we have said today affects the powers of the police to investigate 'an unsolved crime,' Spano v. New York, 360 U.S. 315, 327, 79 S.Ct. 1202, 1209 [3 L.Ed.2d 1265] (Stewart, J., concurring), by gathering information from witnesses and by other 'proper investigative efforts.' Haynes v. Washington, 373 U.S. 503, 519, 83 S.Ct. 1336, 1346 [10 L.Ed.2d 513]. We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer."

The ruling of the Supreme Court is very clear and as of course is to be, and will be, followed explicitly where applicable. The facts of the appeal before us are well without the range of the Escobedo decision. The subject matter here involved was some stolen clothing. Konigsberg was one of five people found with the merchandise. At the time of trial he was thirty-five years old. He had been convicted of robbery in 1949. From his own testimony he was well acquainted with police arrest procedures. All of the people in the garage were told

"This is the F.B.I. You are under arrest." The prisoners were instructed to put their hands against the garage wall. Konigsberg refused so the officers put handcuffs on him. Shortly after that all the prisoners were taken to the F.B.I. office in Newark, a few miles west of Bayonne, in several ordinary passenger cars driven by agents. Konigsberg rode with Agents Straub and Roetzel. Straub advised him that he was entitled to an attorney and that anything he said might be used against him in a court of law. At the F.B.I. office the prisoners were fingerprinted and photographed. Konigsberg had approximately $11,000 currency on his person which he meticulously counted with the agent. Straub testified that " * * * we asked him the circumstances as to why he was in this garage and just what had taken place. * * * We desired to talk and see if he wished to cleanse himself or explain. * * * As to why he was there, what his reasons for being there were, why the other individuals were there." Konigsberg's attorney, who was cross-examining Straub at the time, then said to Straub "Q. If he could explain." Straub answered, "If he could explain. We wanted to hear his side of the story that would come from him, if it would. We had to fingerprint Mr. Konigsberg. We had to photograph him." Agent Roetzel, also there, said that in the course of the talk Konigsberg

" * * * made a statement that this was the only legitimate arrest that the F.B.I. had ever made of him. He made a statement that this was one thing that we had, meaning the F.B.I.— * * * He made the statement that there was one thing that we had that he didn't have, and that was stool pigeons, and he made the statement when he was asked what he was doing in the garage, he said, 'In what garage?' Then followed by a statement that, 'I was trying to help a fellow out.'"

Konigsberg, on the witness stand, denied that he was told by the F.B.I. that he was entitled to a lawyer. Straub stated that Konigsberg on the way to Newark said he wanted to make a telephone call but did not say to whom or the purpose of the call. After the photographing and fingerprinting of the appellants was completed, they were taken across the street to Newark Police Headquarters where Konigsberg was permitted to telephone. He, at that time, telephoned an attorney.

Straub testified that the talk with Konigsberg " * * * was more like a conversation than an interview." He was asked " * * * did you in any way threaten Mr. Konigsberg or extract from him any answers?" He answered "No. I did not threaten Mr. Konigsberg." Asked, "How were these statements that were given by him made?" He answered "This was just a discussion back and forth, at which time he volunteered these statements."

From all of the above, the trial court found:

"As I stated before, I find from the testimony I have heard that the statements made by the defendant Harold Konigsberg when he was in custody were not involuntary statements but on the contrary that they were made voluntarily by him and he had been advised of his rights to counsel and of the fact that anything he might state could be used against him. He was, as I find from the testimony, warned before he made any statements that he was not required to make statements, that any statements he did make could be used against him.

"He was likewise advised of his right to counsel.

"There is no evidence of any intimidation, no evidence, circumstantial or otherwise, that he was under duress or that any hope of reward or promise of leniency were held out to him to induce statements.

"He might well have chosen to refuse to say anything. He chose to make comments, and the text of them would indicate the voluntary nature."

In this appeal at the time the F.B.I. agents talked with Konigsberg the process was definitely investigative and never shifted to accusatory. Its purpose was not to elicit a confession; there were no threats or attempt to extract admissions from Konigsberg, damaging or otherwise. The uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story. None of that is denied by Konigsberg. Focus was not centered on Konigsberg, there was a general inquiry in progress concerning the unsolved hijacking of the Bond clothing. If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity. Nor was there any thought of the alleged tactic in Escobedo of promising if one or more of the prisoners were accused by him Konigsberg would go free. There is nothing in this appeal of Konigsberg which could reasonably bring it within the scope of the Escobedo doctrine.

Since Escobedo is inapplicable to the situation before us, the argument that Konigsberg's statement was involuntary and therefore he was deprived of due process of law under Jackson v. Denno, 84 S.Ct. 1774, 12 L.Ed.2d 908 opinion filed June 22, 1964, must fall.

There were other points on behalf of appellants. We have examined these. They are without merit and need no discussion.

These appellants were given a fair, patient trial. They were competently and tenaciously defended. We find no error.

The judgments of the district court will be affirmed.

Before BIGGS, Chief Judge, and McLAUGHLIN, KALODNER, STALEY, HASTIE, GANEY, SMITH and FREEDMAN, Circuit Judges.

On Petition for Rehearing

PER CURIAM.

In this petition for rehearing, on behalf of appellant and in reliance upon Escobedo v. Illinois, 84 S.Ct. 1758 (op. filed June 22, 1964), the claim is made that Konigsberg's statements to the F.B.I. agents were in effect involuntary. The Escobedo rule quoted in our opinion is that "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused *and its purpose is to elicit a confession*—our adversary system begins to operate, *and, under the circumstances here,* the accused must be permitted to consult with his lawyer." Emphasis supplied. 84 S.Ct. p. 1766. As is seen, in order to apply Escobedo, the process must be accusatory, to elicit a confession and with the circumstances comparable to those in Escobedo. Under the evidence documented in our opinion, we found that the process in this case was investigatory, that it was uncontradicted that there had been no attempt to elicit a confession and that the facts of this matter differed radically from the Escobedo situation. We therefore supported the trial court's conclusion that Konigsberg's statements were voluntary and admissible into evidence.

The petition simply concludes that because Konigsberg was arrested with the others found in the garage and that " * * * they [the F.B.I. agents] knew him and his 'reputation' there was no need for Konigsberg to deny the F.B.I. agents' token and perfunctory statements that the process was investigatory. It was then nothing but accusatory and Konigsberg falls within the protective rule and rationale of Escobedo, supra."

There is nothing in the petition which validly disputes the substantial evidence of the investigative nature of the process as outlined from the record in our opinion. The attack of the appellant, such as it is, goes no further than calling the process accusatory. It makes no pretense that the other two vitally necessary parts of the Escobedo rule were violated i.e. that there was any attempt whatsoever to elicit a confession or that the facts in this appeal were at all comparable to Escobedo.

It is difficult to understand appellant's point with reference to the disclosure of

the identity of the confidential informant. The main brief did rely upon the principle enunciated in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed. 2d 639 (1957). And this reliance was repeated in the reply brief. In the latter there is a quotation from the dissent in Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). But even that dissent quotes with approval the very language from Roviaro that is set out in our opinion.

The remaining contentions in the petition need no comment.

The petition for rehearing will be denied.