[Crim. No. 3653.   Third Dist.   June 17, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM HENRY GARRETT, Defendant and Appellant.

Bernard G. Thompson, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris Maier, Assistant Attorney General, and Anthony DaVigo, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendant accused of voluntary manslaughter (Pen. Code, § 192, subd. 1) was found guilty of involuntary manslaughter (Pen. Code, § 192, subd. 2). He appeals from the judgment.

Peter Santana died of knife wounds incurred as the result of a fight between Santana and defendant. These facts were undisputed. Defendant contended that he acted in self-defense, that the wounds which caused the death of Santana were accidentally inflicted while defendant sought to protect himself against a knife assault by Santana.

On appeal the contentions are: (1) that extrajudicial statements made by defendant were improperly admitted in evidence, and (2) that the evidence was insufficient to support the verdict and judgment.

The fatal fight occurred on February 2, 1964, at the home of the defendant in Stockton. Defendant and Jessie Santana had been living together since August 1963. Three children of Mrs. Santana resided there with them. On the evening of the incident their dinner was interrupted by the arrival of Peter Santana, the estranged husband of Jessie. He had been drinking. He accused Jessie and defendant of teaching the children to call defendant father. He resented this. The accusation was denied and an argument ensued. Santana was told to leave the house and he refused. An altercation, characterized as a "scuffling," commenced between the two men. The principal witness for the prosecution, Jessie Santana, testified

that at first it was not "heated" and that hostilities ceased and Santana indicated he would leave the house. Then, however, Santana called his daughter Stephanie over to him and began to talk to her. He told her: "Tell your Mommy I am your father and for her not to forget it." Subsequent events were described by Jessie as follows: "Then all of a sudden . . . Bill grabbed Peter and he had him, he started pushing him toward the bathroom door and I could see him work body punches towards the stomach. . . . He had Peter against the sill, the bathroom door like there, the corner. Started making jabbing towards his stomach and Peter had his hands up over his head like this. . . . Q. Did you see a knife in the hands of the defendant? A. Well, when he finished cutting him, he put his arms around his neck and I was standing by the coffee table and he brought him like this through the living room with the knife like this by his neck and throw [sic] him out in the front yard."

The knife was produced and identified as belonging to defendant.

Another prosecution witness, Leonard Payne, 11-year-old son of Jessie Santana (Peter Santana's stepson), testified that he thought he had seen the knife earlier that day on the bookcase.

Early in the argument between the two men, Jessie Santana had telephoned for the police. (Although there was some conflict in the evidence, this was undoubtedly before the knifing incident had commenced.) Police Officer James A. Monk was the first to arrive. He observed the stricken Santana lying in the front yard, had an ambulance summoned, and talked with defendant. He asked him what had happened. Defendant said that Santana had come to his house while the family was eating dinner, that there had been an argument, that Santana had grabbed a knife, "and at that time he [i.e., defendant] jumped up, grabbed his arm and at that time the wounds were inflicted." Defendant handed the knife to the officer.

Rose Smith, sister of Santana, received a telephone call from the defendant that evening and he said something to the effect that, "I am sorry that Peter and I got into it and Peter got cut."

Defendant was not taken into custody that night. After the knifing incident, Joseph Santana, brother of Peter, called at the house. He asked defendant what had happened. Defendant answered in part as follows: "[H]e don't know who grabbed

the knife first, if it was him or Peter and he just told me the knife was over by the bookstand in the same area where Peter was sitting. So, they scuffled. He told me that him and Peter scuffled with the knife and he didn't say who had it in whose hand, because he told me he blacked out and then when he come to his senses that Peter fell in his arms and was cut. . . .''

Peter Santana died from the knife wounds about 36 hours after reaching the hospital.

On February 3d, the day following the knifing incident, defendant, acting upon his own volition, went to the district attorney's office and gave a statement. On February 5th he gave another statement freely and voluntarily to a deputy district attorney. This was in the presence of a shorthand reporter. A transcript of the February 5th statement was read at the trial. In this statement defendant related that Santana upon arriving at his house had asked one of the children, ''What the God-damn Hell is this that you can't call me daddy?''—that later he had said: ''I want to know why my kids can't call me daddy—I get the news they are calling this big black son-of-a-bitch daddy.'' After some further conversation, Santana went into the kitchen, then came back into the living room. At that time defendant said he had observed Santana with a knife. Then he said: ''[S]omething clicked in my mind just like when you overseas, you know, I lunged for him. I caught his wrists, his arms, what I remember, catching his arm or something and we was scuffling and the kids started yelling and Jessie started hollering and when he—when I lunged for him he came in my arms, some way I pulled him, and his back came to me and we was scuffling over the knife and some kind of way the detective told me he was stabbed down here somewhere, anyway, some kind of a way he was cut down there . . . .''

Defendant was not in custody when this statement was taken. He was not taken into custody after it was given. His arrest did not occur until February 19th.

Defendant testified at the trial in his own defense. His testimony was substantially the same as the statement, described above, given to the district attorney. Defendant also explained how the knife had gotten on the bookcase. He stated he had used it to cut a shoe strap of Jessie's little girl's shoe that afternoon and had laid the knife on the bookcase afterwards.

The principal contention of defendant is that under

the rule in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.
Rptr. 169, 398 P.2d 361], the evidence of his statements made
February 2d and February 5th to the police officer and deputy
district attorney respectively were inadmissible because de-
fendant had not been advised of his right to remain silent and
of his right to an attorney. We reject this contention. At
the time all the statements received in evidence were given
the defendant was neither in custody, nor had suspicion
focused upon him, nor had interrogation reached the accusa-
tory stage, nor did the questioning lend itself to the eliciting
of a confession.

The conditions expressed in *Dorado* are (to adopt the lan-
guage of the opinion on pages 353, 354): "(1) the investi-
gation was no longer a general inquiry into an unsolved
crime but had begun to focus on a particular suspect, (2) the
suspect was in custody, (3) the authorities had carried out a
process of interrogations that lent itself to eliciting incrimi-
nating statements, (4) the authorities had not effectively
informed defendant of his right to counsel or of his absolute
right to remain silent, and no evidence establishes that he had
waived these rights."

In considering the applicability of the rule to the facts of
this case we must place those facts in a proper perspective.
The first information apparently received by the police was
that an intruder, who had been drinking, was raising a dis-
turbance at the home of defendant. The officers had been
called to eject this man. When they arrived they found the
man lying in the front yard wounded. Officer Monk's inquiry,
"What happened?," asked of defendant (the first person to
appear) was natural and spontaneous. The explanation of
defendant as to what had occurred—that Santana had picked
up the knife and had attacked defendant and had been
wounded while defendant was trying to wrest the knife away
from him—was voluntary and indicated an act in self-defense.

Jessie Santana did not then give any information to the
officers disputing defendant's version of the affray. There
was no reason then to arrest defendant and he was not
arrested.

Next day defendant had gone to the office of the district
attorney. He returned again two days later to give a formal
statement. Both visits were upon defendant's own volition.
Nothing in the transcribed statement would have aroused the
investigating authorities' suspicion. The statement was sub-
stantially identical with that given immediately after the

event. (At the trial counsel for defendant emphasized as a fact indicative of defendant's innocence his willingness at all times to explain the incident to the police.) There is no indication that the authorities, when defendant gave either of the statements admitted into evidence, possessed any of the information which later formed the basis of the accusation and prosecution of defendant. In the transcribed statement of February 5th not a single question asked by the deputy district attorney suggests that any of the matters later testified to by Mrs. Santana, Joseph Santana and Rose Smith were then known.

After defendant had been arrested (on February 19th) he gave another statement on February 20th. This statement was not offered by the prosecution. By that time, no doubt, the interrogation had become one "that lent itself to eliciting incriminating statements."

Under the circumstances, the rule of *People* v. *Dorado*, *supra*, is inapplicable. ■ Applicable, instead, is the following excerpt from Justice Tobriner's opinion in *Dorado*, at p. 354 of 62 Cal.2d: "Nothing that we have said, of course, should be interpreted to restrict law enforcement officers during the investigatory stage from securing information from one who is later accused of the crime or from obtaining answers to their questions. Indeed, any statements obtained without coercion, including, of course, the unsolicited, spontaneous confession, given in the absence of the requirements for the accusatory stage, may be admitted into evidence. As the concurring opinion of Justice Traynor in *People* v. *Garner* (1961) 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680], states: 'So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation.' "

■ Here the police and district attorney were merely listening to explanations given by an apparently innocent party who was not only willing but anxious to give that explanation. Such statements are not improperly received. (*United States* v. *Konigsberg*, 336 F.2d 844, 853.)

■ Defendant's only other contention is that substantial evidence did not support the verdict. Typical of the arguments urged to support that contention is that the testimony of Jessie Santana should not have been believed; that she "lied to protect herself from prosecution for welfare fraud

and also . . . because by her own admission she was bittter towards the appellant for what had actually happened.'' Mrs. Santana's testimony was not inherently unbelievable, and the argument goes merely to the weight which should have been accorded her testimony by the jury. As a reviewing court we cannot, under these circumstances, reweigh this evidence. (See Witkin, Cal. Criminal Procedure (1963) §§ 683, 684, pp. 666, 667, 668, and cases cited.)

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.