**Thomas C. HENDRIX, Regional Director for the Seventeenth Region of the National Labor Relations Board for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**S. S. KRESGE COMPANY, Respondent.**

Civ. A. No. 77–2227.

United States District Court,
D. Kansas.

Oct. 28, 1977.

Robert J. Janowitz, Regional Atty., David A. Nixon, Atty., Seventeenth Region, N.L.R.B., Kansas City, Kan., for petitioner.

J. D. Lysaught, of Weeks, Thomas, Lysaught, Bingham & Mustain, Overland Park, Kan., Carl W. Robertson, of Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for respondent.

### MEMORANDUM AND ORDER

O'CONNOR, District Judge.

The Regional Director for the Seventeenth Region of the National Labor Relations Board (hereinafter "Board") has petitioned this court for temporary injunctive relief pursuant to Section 10(j) of the National Labor Relations Act, [29 U.S.C. § 160(j)], pending the determination by the Board of a complaint alleging unfair labor practices by the respondent employer S. S. Kresge Company.

The petition was filed after the issuance of a complaint pursuant to Section 10(b) of the Act and is predicated upon the Board's conclusion that there is reasonable cause to believe that Kresge has engaged in and is engaging in conduct violative of Sections 8(a)1, and 8(a)5 of the Act. Specifically, the Board accuses Kresge of failure to bargain in good faith.

Upon an order to show cause, an evidentiary hearing was held on September 20 and September 26, 1977. Having thoroughly re-

viewed the evidence and the briefs submitted by the parties, the court is now prepared to render its decision.

### FINDINGS OF FACT

1. This proceeding concerns events transpiring at the "K–Mart Distribution Center" at Lawrence, Kansas. The Distribution Center is owned by respondent Kresge and is located within the District of Kansas.

2. Kresge is a corporation engaged in a multistate mass retail business. In the course of operating its business conducted at the Distribution Center, Kresge annually purchases goods and materials valued in excess of $50,000 directly from suppliers located outside the State of Kansas; and annually receives gross revenues in excess of $500,000.

3. The Union, Truckdrivers and Helpers Local Union No. 696, International Brotherhood of Teamsters, Chauffeurs and Warehousemen of America (hereinafter referred to as the "Union"), an unincorporated association, is an organization in which employees participate and which exists for the purpose, in all or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, and hours of employment.

4. On or about October 18, 1976, the Union was certified by the Board as the exclusive bargaining representative for the employees of Kresge in the unit (described below in paragraph 14), following an election on April 29, 1976. The election conducted by the Board was predicated upon a representation petition filed by the Union, under Section 9(c) of the Act, in Case No. 17–RC–7951.

5. At all times since April 29, 1976, and continuing to date, the Union has been, and is now, the exclusive bargaining representative of all the employees in said unit with respect to rates of pay, wages, hours of employment, and other terms and conditions of employment.

6. On or about October 13, 1976, the Union filed a Charge known on the Board's books and records as Case No. 17–CA–7337, alleging, *inter alia*, that Kresge had unilaterally changed certain wages, hours and working conditions in violation of Sections 8(a)(1) and 8(a)(5) of the Act.

7. On or about November 15, 1976, the Board issued a Complaint and Notice of Hearing in Case No. 17–CA–7337 alleging that during the period between the date of the representation election, April 29, 1976, and prior to the date of certification of the Union by the Board, October 18, 1976, Kresge had made certain unilateral changes in wages, hours and working conditions.

8. On January 20, 1977, Kresge and the Union entered into an informal Settlement Agreement in Case No. 17–CA–7337, which was approved by the Board, and provided for the withdrawal of the Complaint and Notice of Hearing in Case No. 17–CA–7337.

9. The Settlement Agreement provided that Kresge would refrain from (1) granting benefits, eliminating jobs, or making other unilateral changes in wages, hours and working conditions of its employees without first giving notice to and bargaining with the Union; (2) unilaterally establishing a quota system without first bargaining with the Union; (3) that it would post job openings and would not unilaterally change its job bidding procedures without first bargaining with the Union; and (4) that it would interpret its leave of absence policy in accordance with the leave of absence policy set forth in its Employee Handbook.

10. On or about April 6, 1977, the Union filed a charge known on the Board's books and records as Case No. 17–CA–7600, alleging that Kresge had engaged in unfair labor practices within the meaning of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the Act.

11. On or about April 25, 1977, the Union filed an amended charge in Case No. 17–CA–7600. Thereafter, on or about June 1, 1977, the Union filed a second amended charge in Case No. 17–CA–7600, alleging that Kresge had engaged in unfair labor practices within the meaning of Sections 8(a)(1) and 8(a)(5) of the Act, and, thereby, eliminated the allegations relating to Section 8(a)(3) of the Act, asserted in the original charge and the first amended charge.

12. By letter dated June 9, 1977, the Board advised Kresge and the Union that it was withdrawing its approval of the informal Settlement Agreement entered into by the parties on January 20, 1977, which informal Settlement Agreement had disposed of the Complaint proceedings in Case No. 17–CA–7337.

13. On or about June 14, 1977, the Board issued its Order Consolidating Cases Nos. 17–CA–7337 and 17–CA–7600 and issued the Consolidated Complaint, which is before the court. Kresge filed a timely Answer to the Consolidated Complaint, and a hearing was scheduled for October 12, 1977, for adjudication on the merits before an Administrative Law Judge of the Board.

14. The following employees of Kresge constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

All warehouse employees of Kresge at its warehouse, including warehousemen, security cage employees, checkers, maintenance employees, regular part-time employees, plant clerical employees (traffic employees, merchandise checkers, claims employees, O. S. & D. Clerk, file clerk, dispatchers, company store employees, case pack adjustment clerks), but EXCLUDING all office clerical employees (data processing employees, data processing manager, front office adjustment clerks, merchandising or receiving clerks, payroll employees, receptionist and switchboard operator, assistant to the merchandise manager), secretaries, confidential employees, general manager, distribution or personnel manager, merchandise manager, warehouse departmental managers, nightshift manager, assistant managers, professional employees, guards and other supervisors as defined in the Act.

15. Basically, the Board alleges that Kresge has committed unfair labor practices in violation of Section 8(a)(1) of the Act (intimidating employees in the exercise of their rights), and Section 8(a)(5) of the Act (failure to bargain in good faith). The Board contends that Kresge has violated Section 8(a)(5) by engaging in surface bargaining, and also by instituting several unilateral changes in working conditions while negotiations are pending without consulting the Union.

16. The Board presented evidence that Kresge had changed its employee "leave of absence" policy in May of 1976, to provide for leaves of absence being granted only in cases of extreme emergency; Kresge presented evidence that leaves of absence to employees had always been granted only when such leaves were approved by the plant manager, and that the granting of such leaves was a matter within the sound discretion of said plant manager, and that Kresge's policy regarding leaves of absence has not changed.

17. The Board presented evidence that Kresge had changed its policy with respect to physicians authorized to examine employees for industrial accidents to provide that only Dr. H. Penfield Jones, or his designee, would be the authorized physician for such industrial accidents beginning July, 1976; Kresge presented evidence that its policy in regard to doctors authorized to examine employees for industrial accidents has not changed.

18. The Board presented evidence to show that Kresge had changed its policy in July of 1976, in regard to allowing employees to obtain refunds for items purchased from the company; Kresge presented evidence that it merely posted a notice reminding employees that refunds were to be limited to situations where items purchased were found to be defective, and refunds were not to be allowed for items which employees had simply decided after a period of use that they did not wish to purchase after all.

19. The Board presented evidence that Kresge had changed its "order pulling quota" for employees on the "third shift" from 50 to 85 slots per night beginning in early July of 1976; Kresge presented evidence that it has never had a "order pulling quota" for any of its employees.

20. The Board presented evidence that Kresge had eliminated the "Christmas Remembrance Program" on March 24, 1977; Kresge presented evidence that it has not to this date eliminated the "Christmas Remembrance Program."

21. The Board presented evidence that Kresge had eliminated the "employee discount program" as of March 24, 1977; Kresge presented evidence that it has not in any manner eliminated the "employee discount program," but that said program has merely been altered, due to the opening of a "K–Mart" store in the Lawrence area. Instead of ordering merchandise through the Distribution Center, employees may go to the K–Mart Store in Lawrence and purchase items at their discount price.

22. The Board presented evidence that Kresge had eliminated the "third shift" at the Distribution Center as of April 4, 1977 (effective April 18, 1977); Kresge presented evidence that the elimination of the "third shift" was in fact discussed with the Union ahead of time, and that such action was taken due to the fact that the "third shift" was no longer necessary nor economically feasible, and that extensive efforts were made to place all "third shift" employees in appropriate positions on either the first or second shifts.

23. The Board presented evidence that Kresge was guilty of failure to bargain in good faith by insisting upon an overly broad "management's rights" clause; Kresge presented evidence that while its "management's rights" clause was certainly a strong one, such a clause was not at all an unusual first proposal in a collective bargaining negotiation process.

24. The Board presented evidence that Kresge was guilty of failure to negotiate in good faith by its refusal to accept the Union's proposed "maintenance of benefits" clause; Kresge presented evidence that such a "maintenance of benefits" clause was a clause that would rarely, if ever, be acceptable to management, since it did not spell out precisely what benefits employees currently had, but merely stated that they would retain all benefits which they held at the present time. Thus, Kresge contends that the "maintenance of benefits" clause so offered was unacceptable since it did not precisely spell out what specific benefits were currently held by the Union.

25. The Board presented evidence that Kresge was guilty of failure to negotiate in good faith in that it refused to make a wage proposal to the Union until July 27, 1977, several months after negotiations had begun; Kresge presented evidence that it was fairly routine for management to insist upon resolution of all noneconomic issues before making any wage offer.

26. The Board presented evidence in an attempt to show that Kresge was guilty of failure to bargain in good faith by its refusal to accept the implementation of a temporary grievance procedure while the negotiations were continuing; Kresge presented evidence tending to show that it had never refused such an interim grievance procedure, and pointed out that such a procedure had been accepted and implemented as of July 27, 1977.

27. The evidence presented by the Board to show that Kresge had committed violations of Section 8(a)(1) of the Act covered four separate incidents. The first occurred in June of 1976 and involved employee Nancy Lopez. Ms. Lopez testified as follows:

"This was a job interview and we discussed aspects of the job and Mr. Dickey asked me if I had heard anything about the union at Kresge's. I said yes, and then he said, well, you know, the union was only voted in by a very slight margin, and then he said that they didn't like the union and that he didn't feel that they needed a third person to come in and tell them how to run their business." (Transcript at 135).

28. The second incident also involved Ms. Lopez and occurred in November of 1976. With respect to this incident, Ms. Lopez testified as follows:

"Mr. Holland came up to me and asked if I had attended the union meeting the Saturday before. I said that I had. He asked me if there were a lot of people at

that meeting. I said yes, I thought there were quite a few people there. He then asked me how many people were at the meeting. I said I thought there were quite a few people there. He asked me what we talked about, if any policies or rules had been changed. I said to him that I thought the biggest change was in the job transfer system, that we wanted to go back to the old job transfer system. He said, well, that he liked the present job transfer system better and he didn't see why we needed a union, anyway, with a man like Mr. Fisher, that an employee could go to Mr. Fisher any time and talk to him about their problems and he didn't feel that we needed a union to solve employees' problems." (Transcript at 136–137).

29. The third incident occurred on April 27, 1977, and involved a meeting between an employee named David Frear and certain members of management, including plant manager Fisher. Employee John Lowe testified that he attempted to attend said meeting in his capacity as union steward, but was told that the company did not recognize a union steward, and was asked to leave, whereupon he did; Kresge did not essentially deny the Board's version of the incident. However, Kresge contends that at that time it was not aware that John Lowe had been designated a union steward. Kresge further contends that the meeting did not involve discipline of an employee, that the meeting was requested not by management but by Frear himself, and therefore union steward representation was unnecessary.

30. The fourth incident occurred on August 1, 1977, concerning an employee named John Albers. On that date, Albers was summoned to the "front office" by certain members of management, and was later discharged. John Lowe again attempted to attend such meeting in his capacity as union steward, but was again prohibited from doing so; Kresge again presented no evidence disputing the incident, but contends that employee Albers was summoned to the front office for the sole purpose of informing him that he had been discharged, that the decision to discharge Albers had already been made by plant manager Fisher, and that therefore union steward representation was completely unnecessary.

## CONCLUSION AND DISCUSSION

The authority for this court to grant the injunctive relief requested is found in Section 10(j) of the Act:

"The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or in engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and *thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."* (Emphasis supplied).

■ In order to justify the issuance of a 10(j) injunction, the Board must show, and the court must find, first that there is reasonable cause to believe that the acts alleged actually occurred, second that there is reasonable cause to believe the acts alleged constitute an unfair labor practice, and third, that the relief prayed for is just and proper under the facts and circumstances of the particular case. *Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967); *Boire v. International Brotherhood of Teamsters, etc.*, 479 F.2d 778 (5th Cir. 1973); *McLeod v. General Electric Co.*, 366 F.2d 847 (2nd Cir. 1966). In *Angle*, the Tenth Circuit emphasized that "the circumstances of the case must demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted." 382 F.2d at 660.

■ After considerable deliberation, the court has determined that, even assuming that the Board has established reasonable

cause to believe that Kresge has violated Sections 8(a)(1) and 8(a)(5) of the Act, issuance of an injunction would not be "proper and just" under all the circumstances.

An excellent discussion of the propriety of granting relief under Section 10(j) is found in the case of *Squillacote v. International Union, etc.*, 384 F.Supp. 1171 (E.D. Wis.1974):

> "The dispositive issue presented by the Board's petition is whether the injunctive relief is 'proper and just' under the facts and circumstances presented to the court. An injunction should be issued only in extraordinary circumstances or when a drastic remedy is necessary. *McLeod v. General Electric Co.*, 336 F.2d 847 (2nd Cir. 1966); *Minnesota Mining & Mfg. Co. v. Meter*, 385 F.2d 265 (8th Cir. 1967); *Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967). This is particularly true in the field of labor law where Congress by the Norris-LaGuardia Act deprived the federal courts of jurisdiction to issue injunctions in labor disputes. *McLeod v. General Electric Co., supra.* While Section 10(j) carves out an exception to the blanket prohibition of Norris-LaGuardia, Section 10(j) must be construed in light of the congressional recognition of the dangers inherent in conducting labor relations by way of injunction.

> In enacting Section 10(j), Congress recognized that the Board's adjudication of unfair labor practice charges may be very time consuming. Thus, Congress felt that under proper circumstances injunctive relief would be required to preserve the status quo pending the final adjudication of the Board and thereby protect the efficacy of the Board's final order. Consequently, the purpose of a 10(j) injunction is to preserve the status quo while the parties are awaiting the resolution of their basic dispute by the Board. If the 10(j) injunction will not preserve the status quo pending the Board's resolution of the charges before it, the injunction will not accomplish the purposes of 10(j) and is not proper.

> Section 10(j) was not intended to change the basic procedure under the National Labor Relations Act which creates a system in which the Board, as an expert in the area, would in the first instance consider and decide the issues before it, subject to later review of the court of appeals. Thus, where the Board seeks to alter the normal procedure under the Act, it must demonstrate to the court that the impact on the 'public interest' is grave enough to justify the swifter corrective action authorized by 10(j) than is available under normal Board adjudication and court enforcement."

Turning first to the Board's contention that Kresge has not bargained in good faith, we are of the opinion that temporary injunctive relief is an inappropriate method of dealing with this issue under the evidence presented. Our attention has not been directed to, nor has our research disclosed, a single case in which a federal judge has issued a 10(j) injunction directing the respondent to "bargain in good faith." This situation undoubtedly arises because the question of good faith bargaining is extremely complex from both a factual and a legal standpoint. As the Board itself virtually concedes in its brief, determination of the good faith issue is difficult and subjective, and involves delving into the mental state of the respondent's agents to determine their actual motives and intent.

We are aware that in testing the *validity* of an unfair labor practice charge in a hearing where 10(j) relief is requested, the court is to do no more than determine "reasonable cause."[1] However, in determining the *propriety* of injunctive relief, the court must consider the *nature* of the charge. Relief under Section 10(j) would be far more appropriate in cases where the facts presented by the Board clearly established an unfair labor practice. For example, if

---

1. The "reasonable cause" standard appears to be somewhat less than "probable cause" or a "preponderance" of the evidence; it requires only that there be "sufficient evidence from which the Board could find a violation of law." *Kennedy v. Sheet Metal Workers*, 289 F.Supp. 65 (D.C.Cal.1968).

Kresge were charged with threatening employees with discharge if they did not cease Union activities, injunctive relief might be appropriate whether or not the evidence was substantially disputed. The issuance of an injunction in such a case could only serve to preserve the status quo, and could not possibly harm the respondent, since the respondent would only be ordered to refrain from committing acts which are clearly illegal.

On the other hand, the dispute here centers not just upon the facts, but upon the legal conclusions which can be drawn from those facts. On many points, the parties' descriptions of what transpired are actually quite similar; but there is violent disagreement when it comes to the motives behind or inferences to be drawn from certain acts or words. Thus, we find the parties agreeing generally as to what was or was not accomplished at a particular bargaining session, but strenuously disagreeing about who made particular statements at such sessions, in what context such statements were made, and the true intent of the speakers. Such divergency is no doubt common in the collective bargaining process, but it does not necessarily support a conclusion that a party has failed to bargain in good faith.

The court is certainly not in a position at this time to make any determination as to whether Kresge has or has not bargained in good faith. The court could conceivably make a finding that "reasonable cause" exists to believe that Kresge has failed to bargain in good faith. Even if the court made such a finding, the issuance of an injunction under the circumstances of this case would in the court's view be inappropriate and meaningless. The court would be unable to frame the injunction in specific terms so that Kresge could govern its conduct in the interim with impunity. Obviously, an injunction in general terms would do nothing to "preserve the status quo." Its enforcement would be an impossibility. Further, the granting of an injunction would thrust the court into the bargaining arena, a situation clearly not contemplated by Congress in enacting Section 10(j). The court concludes that the Board's charge that Kresge has failed to bargain in good

faith does not require the expedited treatment authorized by Section 10(j), and is best left to the decision of an administrative law judge, with appropriate enforcement proceedings as provided by law.

With respect to the charge that Kresge has violated Section 8(a)(1) of the Act, the court concludes that the four incidents described relating to this issue are not of such numerosity or seriousness as to warrant the issuance of an injunction. The question of the employees' right to union steward representation appears to have been resolved. The evidence tends to show that at this time Kresge has accepted union steward representation, thus issuance of an injunction on this ground would be unnecessary. The incidents wherein supervisory personnel allegedly made remarks discouraging employee participation in union activities occurred in June and November of 1976; no evidence was presented that such actions have occurred recently or are likely to occur in the future. The Board's request for such relief is therefore denied.

For the reasons discussed, the Board's request for injunctive relief is denied. This is not intended to imply any opinion about the merits of the Union's complaint. The court has merely concluded that the extraordinary relief requested is unwarranted under all the facts and circumstances.